## Stewart et al., Trustees, *v.* Northwestern Coal & Iron Co., Appellant.

*Mines and mining—Coal lease—Covenants—Right of way.*

The owner of coal lands contracted to " grant, bargain, sell and convey the stone coal lying and being under " a tract of land, with mining privileges and with the right to erect machinery shops and houses on the surface, such as might be needed for the convenient and economical mining of the coal. The consideration was the payment of a certain royalty per ton, the purchaser to remove 2000 tons of coal each year, and to pay for that quantity whether it was removed or not, until the coal was exhausted. It was also provided that if the purchaser should find that by reason either of the "quantity, quality or condition of the coal " it was not practicable to mine the coal with profit he might abandon the contract and yield up the coal mine and privileges without mining the remainder of the coal. Another stipulation was that the purchaser should have " the right of way through, over or under said land to transport coal from adjoining lands. . . . and the use of five acres of land " on which to erect dwelling-houses, " paying said first party a fair annual rental for said five acres of ground. *Held,* that the grant of the right of way for operating the adjoining lands was independent of the sale of the coal and the mining privileges. *Held, also,* that after all the coal was removed, the lessee had simply a right of way through the chamber, and that the lessor was in possession by virtue of his ownership.

Argued Oct. 14, 1891. Appeal, No. 277, Oct. T., 1891, by defendant, from judgment of C. P. Mercer Co., Jan. T., 1891, No. 217, on verdict for plaintiff. Before PAXSON, C. J., STERRETT, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Ejectment by W. N. Stewart and W. W. Taylor, executors and trustees of James Bestwick, Jr., deceased, against the Northwestern Coal & Iron Company. The case was tried by the court without a jury; MEHARD, J., filed the following opinion :

" Articles of agreement bearing date Nov. 22, A. D. 1878, were made and executed by and between James Bestwick, Jr., of first part, and L. M. Ormsby and John J. Spearman, of the second part, whereby the first party granted to the second party, their heirs and assigns, certain stone coal in place, coal mining rights, privileges and facilities. The second party covenanted for themselves, their heirs and assigns, inter alia, ' to mine and remove from said land yearly, while said coal shall continue

profitably minable, not less than two thousand tons . . . . of screened coal, or pay for that quantity as though mined at the rate of fifteen cents a ton.   It was therein stipulated that settlements and payments were to be made quarter yearly, on the first days of July, October, January and April each year during the continuance of this lease.'   It was agreed that 'upon failure of the second party to pay first party according to this agreement or within thirty days, this contract shall be null and void.'   The agreement then proceeds as follows, viz.: ' It is mutually understood and agreed that the second party, their heirs and assigns, shall have the right to abandon this contract and yield up said coal mine and privileges at any time they shall determine in their judgment that said coal is in quantity, quality and condition no longer minable with economy and profit.   And when this contract shall be ended for any reason, said second party, their heirs and assigns, shall have the right to remove their machinery and other structures and property from said land by paying up all arrears up to that time, and after that no more rent shall become" (due) ; see copy of agreement in evidence marked Exhibit A.

   " The defendant is in possession of the land described in the writ under the title so granted to L. M. Ormsby and Jno. J. Spearman.

   " The grantor, James Bestwick, Jr., died on Nov. 1, A. D. 1889, having made his last will and testament, wherein he appointed the plaintiffs executors and trustees of his estate. The coal mined and unpaid for at that time, under said articles of agreement, amounted to one hundred and twenty-four dollars and sixty-five cents ($124.65).   That sum has not been paid, nor has any other payment been made since that time on said articles of agreement.   No coal has been mined under said articles since October, A. D. 1889.   All the coal so granted has been mined out save some pillars and other parts left standing in order to support the roof of the main entry, and said remaining coal is not profitably minable.   The entry thus supported is necessary to the proper use of defendants' mine for the removal of coal from other lands and has been so used whenever the mine is in operation.

   " The plaintiff's right to the amount due for coal actually mined is not in dispute.   The defendant concedes it, and has

held itself ready to pay that amount. The question is, whether the plaintiff is entitled to the stipulated royalty since the coal ceased to be profitably minable.

"If the part of the contract first quoted stood alone, it would clearly limit the obligation of the grantees and their assigns to mine or pay for the specified quantity of coal, to such time as it should ' continue profitably minable.' But the next part quoted binds the grantees to make settlements and payments quarter yearly ' each year during the continuance of this lease.' It is clear that this implied that payments of royalty were to continue to fall due as long as the lease continued to live. The same implication is found in the following clause, to wit: ' And when this contract shall be ended for any reason, said second party, their heirs and assigns shall have the right to remove their machinery and other structures and property from said land by paying up all arrears up to that time, and after that no more rent shall become due:' After what? Clearly, after the ' contract shall be ended' and the machinery, etc., removed, or the coal mine yielded up without such removal. Moreover, the parties of that contract constituted the grantees, their heirs or assigns, a forum to determine when the coal should cease to be minable with economy and profit, and gave them the right thereupon to put an end to their obligation to pay the royalty by abandoning the contract and yielding up the coal mine and privileges held under the contract. Good faith would hardly allow the grantees, or their assigns, to hold on to the benefits of the contract and at the same time say that the coal was no longer minable with ' economy and profit.' If that allegation be true, they should abandon their contract and yield up the coal mine and privileges.

" [For these reasons it is considered that the meaning of the contract of Nov. 22, A. D. 1878 (Exhibit A), is, that the royalty or rent therein agreed upon should continue to fall due quarterly during the continuance of the grant thereby made.] [3]

" And now, July 1, A. D. 1891, the prothonotary is directed to file this decision, to forthwith give notice to the parties or their attorneys, and if no exceptions be filed thereto within thirty days after service of such notice, he shall enter judgment in favor of plaintiffs and against the defendant for the land de-

scribed in the above writ, and cost, to be released, however, up-
on payment by defendant to plaintiff of the sum of six hundred
and six dollars and fifty-seven cents ($606.57), with interest
thereon from Aug. 1, 1891, within sixty days from date of said
judgment, said amount being the several payments due on said
articles of agreement up to and including July 1, A. D. 1891."

The defendant filed the following exceptions:

1. That under the terms of the contract the mortgage pur-
chaser was bound to mine or pay for 2000 tons of coal at the
rate of 15 cents per ton, although the property should not be
profitably minable, or abandon the property. [1]

2. That the court decided that there was due from defend-
ants the sum of $606.57. The amount due was much less than
that sum, to wit: Not to exceed in any contingency $125. [2]

. The court overruled the exceptions.

*Errors assigned* were (1, 2) the dismissal of the exceptions,
quoting them; and (3) the portion of the opinion in brackets,
quoting it.

*S. R. Mason*, with him *J. D. Hancock*, for appellant.

*S. B. Griffith*, of *Griffith & Son*, for appellee.

OPINION BY MR. JUSTICE WILLIAMS, March 28, 1892.

The paper books do not furnish us with the writ or the
declaration in this case. We have no means of learning what
the plaintiff claimed, except as it may be gathered from the
abstract of the docket entries. From this abstract we learn
that the suit was brought to recover " all the mineral coal ly-
ing in and under the following described tract of land . . . .
including, also, with the coal and mining privileges, all that
portion of the surface of said tract of land occupied . . . . with
shafts, engines, railroads, and buildings of various kinds, used
in operating said mine." The part of the surface sought to
be recovered has no definite description as to boundary or quan-
tity. It is not separated from that part of the surface of the
same tract which defendants held under lease, upon which
a portion of their buildings were. The description, such as it
is, seems to have been intended to include a body of coal in
place under the tract, and such part of the surface as was used
in connection with mining operations. The defendant has
raised no question over the sufficiency of the description, but

denies the plaintiff's right to recover. The defence set up is that the coal described was bought at a fixed price per ton, in place, had been all mined before suit bought, and paid for, except the small sum of one hundred and twenty-five dollars and sixty-five cents ($125.65), which the defendant was ready and willing to pay. The defendant also asserted a right to use the main gangway of the mine, notwithstanding mining operations on the tract had ceased, as a means of reaching the coal on an adjoining tract. This right he claimed by express grant contained in the original contract with the plaintiff for the purchase of the coal. The case was tried without a jury, and the learned judge who heard it found the facts to be as asserted, viz.: that the coal had been mined, and paid for as agreed, except as to the small balance admitted to be due. He found that the defendants were not occupying the mine as such, and had not been, since mining operations closed in October, 1889, by reason of the exhaustion of the coal. He nevertheless found that the " defendant is in possession of the land described in the writ," and directed judgment accordingly in favor of the plaintiff "for the land described in the above writ." Although no distinct findings of fact were made upon the subject, we understand this result was reached because of the use by the defendant of the gangway as a means of access to the coal upon another tract. The learned judge seems to have held that the right to the use of the gangway ended when the coal was removed from the plaintiff's tract, and that the use of it could only be continued upon the payment of the minimum annual royalty for the coal, which had been fixed by the contract of sale. This case depends upon the correctness of this construction of the contract. It appears that Bestwick, in 1878, entered into a contract to "grant, bargain, sell and convey the stone coal lying and being under and upon the following land," describing the tract, which is described in the writ in this case. With the coal· the grantor sold, also, mining privileges, with the right to erect machinery shops and houses on the surface, such as might be needed for the convenient and economical mining of the coal. The consideration of this sale and grant was the payment of a royalty upon the coal at the rate of fifteen cents ($.15) per ton for lump coal and one dollar ($1.00) per car load for nut coal. The purchaser was to remove at least

two thousand tons (2,000) of screened coal each year, and to pay for that quantity annually, whether it was removed or not, until the coal was exhausted. It was further provided that, if the purchasers should at any time find that, by reason either of the "quantity, quality or condition of the coal," it was not practicable to mine the coal with profit, they might surrender the mine, or, in the language of the writing, "abandon this contract and yield up said coal mine and privileges" without mining the remainder of the coal.

Another stipulation was that the purchaser should have "the right of way through, over or under said land to transport coal from adjoining lands, . . . and the use of five acres of land, to be designated by said first party, on which said second party may erect dwelling houses, paying said first party a fair annual rental for said five acres of ground." These provisions are additional to those relating to the sale of the coal under the tract, and they relate to the mining and removal of the coal on adjoining lands belonging to the second parties. The rent for the five acres of surface is independent of the sale of the grantor's coal and the necessary privileges granted for the convenient mining of it. Upon the right of way no price is fixed, presumably because its use could inflict no loss or inconvenience on the grantor. Now the learned judge did not give any definite form to his findings upon this subject, but it is evident that he must have reached the conclusion that the covenants relating to the mining of the coal on adjoining lands were dependent on those relating to the mining of the coal under the grantor's land; and that, if the purchaser mined out that tract first, he could no longer occupy his right of way or his leasehold on the surface, for the purpose of getting out his own coal that lay beyond, unless he pretended to be still mining the grantor's coal, and paid the royalty upon two thousand (2000) tons per annum which he did not get, because it was not there. If this was the theory on which the recovery was had, we do not think it can be sustained. These covenants have no connection with each other. They relate to subjects entirely different, and each can stand regardless of the other. Those relating to the sale of the grantor's coal are clear, consistent, and make a contract complete in all its parts. Those relating to the grant of conveniences for the

removal of the grantee's coal from adjoining land, are also clear, consistent, and make a valid grant of the privileges to which they relate. But it is urged that there is another clause in the contract which sustains the ruling of the court below, and our attention is drawn to a provision evidently intended for the benefit, not of the grantor, but the grantee. This is a provision that if the further mining of coal should become at any time too difficult or expensive to be conducted with profit, the grantee may abandon the mine, without liability, and the contract shall thereupon cease to be operative. The object of this is apparent. The sale was of all the coal. It might be contended that the buyer was bound to remove and pay for it all regardless of the difficulty or cost of mining. To guard against this possible construction of the contract the parties stipulated that coal that could not be mined with some profit need not be mined at all; and that when such a condition was reached the purchaser might surrender what was left, and be relieved from the obligation both to mine and to pay for the coal so surrendered. This provision relates clearly, and by its terms, to the coal of the vendor, which was the subject of the contract of sale. It does not relate to or include the five acres of surface for which the defendant was to pay rent, and upon which he was to build his miners' houses for operating on the adjoining land, nor the "right of way through, over or under said land to transport coal from adjoining lands." When the coal sold to the defendants was all mined and paid for, no further royalties were due. So long as defendant continues to use the five acres under his lease he must pay rent, and so long as he uses the right of way under the plaintiff's lands he must not exclude the plaintiff from any reasonable use of the same gangway, nor interfere in any manner with the mine from which he has removed the coal. His right is only a right of way. For every other purpose the plaintiff is, by virtue of his ownership, in possession. As the only portion of the tract described which the defendant appears to be in possession of under the contract is the gangway; and as the small balance, due as royalty for the coal mined, is in no sense the purchase money of the right of way through and along the gangway to reach coal on adjoining lands, we have no alternative but to reverse the judgment of the court below.

The judgment is reversed accordingly.